Charles J. Crueger (pro hac vice to be submitted)
Erin K. Dickinson (pro hac vice to be submitted)
CRUEGER DICKINSON LLC
4532 North Oakland Avenue
Whitefish Bay, WI 53211
Tel.: (414) 210-3868
cjc@cruegerdickinson.com
ekd@cruegerdickinson.com

Caryn Markowitz Groedel (pro hac vice to be submitted)
Matthew Grimsley (pro hac vice to be submitted)
CARYN GROEDEL & ASSOCIATES CO., LPA
31340 Solon Road, Suite 27
Cleveland, OH 44139
Tel.: (440) 544-1122
Fax: (440) 996-0064
cgroedel@groedel-law.com

Edward A. Wallace (pro hac vice to be submitted)
Kara A. Elgersma (pro hac vice to be submitted)
WEXLER WALLACE LLP
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Tel.: (312) 346-2222
Fax: (312) 346-0022
eaw@wexlerwallace.com
kae@wexlerwallace.com

Greg F. Coleman (pro hac vice to be submitted)
GREG COLEMAN LAW PC
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel.: (865) 247-0080
Fax: (865) 522-0049
greg@gregcolemanlaw.com

Samuel J. Strauss, Esq. (pro hac vice to be submitted)
TURKE & STRAUSS LLP
613 Williamson Street, Suite 201
Madison, WI 53703
Tel.: (608) 237-1775

1

Gretchen M. Nelson (SBN 112556)
Gabriel S. Barenfeld (SBN 224146)
NELSON & FRAENKEL, LLP
707 Wilshire Blvd, Suite 3600
Los Angeles, CA 90017
Tel.: (844) 622-6469
Fax: (213) 622-6019
gnelson@nflawfirm.com
gbarenfeld@nflawfirm.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| CECIL GOFF; WILLIAM BERGDOLL; PATRICIA PACHECO, | Case No.:  2:17-cv-7358 |
| Plaintiffs | |
| v. | **CLASS ACTION COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF FOR VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT** |
| NATIONWIDE MUTUAL INSURANCE COMPANY; NATIONWIDE MUTUAL FIRE INSURANCE COMPANY; NATIONWIDE GENERAL INSURANCE COMPANY; NATIONWIDE PROPERTY AND CASUALTY INSURANCE COMPANY; NATIONWIDE LIFE INSURANCE COMPANY; NATIONWIDE VARIABLE LIFE INSURANCE COMPANY; NATIONWIDE FINANCIAL GENERAL AGENCY, INC.; NATIONWIDE BANK, | Jury Trial Demanded |
| Defendants. | |

Plaintiffs, Cecil Goff, William Bergdoll, and Patricia Pacheco, individually and on behalf of all others similarly situated, state, upon personal knowledge, and upon information and belief formed as a result of the investigation of counsel:

## SUMMARY OF THE ACTION

1.    The Defendants are Nationwide Mutual Insurance Company, Nationwide Mutual Fire Insurance Company, Nationwide General Insurance Company, Nationwide Property and Casualty Insurance Company, Nationwide Life Insurance Company, Nationwide Variable Life Insurance Company, Nationwide Financial General Agency (together, "Insurance Defendants" or "Nationwide"), and Nationwide Bank (previously known as Nationwide Federal Credit Union).

2.    Plaintiffs and the putative class ("Agents") are current or former captive insurance agents employed by the Insurance Defendants.

3.    From 2003 to the present, Defendants created and conducted a RICO enterprise, described below, to fraudulently induce the Agents to make large "investments" that they had little to no chance of recouping into a business they did not actually own, all for the Defendants' economic benefit.

4.    The fraudulent scheme involved creating, operating, and inducing individuals to join Nationwide's agent "programs," including the Agency Executive Program ("AE Program"), the Replacement Agency Executive Program ("RAE Program"), and the Agency Advantage Program ("Advantage Program") (collectively "Agent Programs" or the "Programs").

5.    The Insurance Defendants regularly recruited inexperienced agents or agents with limited experience into their Programs by promising them "business ownership," misrepresenting their chances of success and incomes prospects, and promising a long and successful "career" as agents once they "graduated" from the Programs.

CLASS ACTION COMPLAINT

6.      Based on these and other promises, thousands of individuals across the United States joined the Agent Programs.

7.      Once the Agents joined a Program and signed the Program contract, Defendants immediately and fraudulently induced the Agents to deplete their savings and retirement accounts, and/or borrow large sums of money through a sham loan program with Nationwide Bank, to build out, staff, advertise, furnish, and start up "their" insurance agencies, according to what Nationwide represented.

Defendants did this by telling the Agents that they "owned" their books of business and their agencies, that they were "business owners," and by misleading the Agents that the "investments" made in "their" businesses would be easily recouped during their "careers" as Nationwide agents.

8.      The Insurance Defendants knew when they made these promises and representations that they were false.  The Agents did not own their own agencies or their books of business. Rather, Nationwide owned the agency books of business, and the customers were Nationwide's customers, not the Agents' customers. The Insurance Defendants knew that nearly all the Agents who made the significant "investments" that Nationwide required would never recoup those "investments" through commissions. Indeed, the Insurance Defendantsknew that most of the Agents it recruited would fail, but Defendants never disclosed the extremely high failure rate to the Agents either before or after they entered a Program.

9.      Defendants likewise did not disclose the extremely high failure rate to the Agents before they agreed, at Nationwide's insistence, to borrow substantial sums of money from Nationwide Bank to fund the "investments" into Nationwide's business.

10.      As a result, Defendants defrauded the Agents into subsidizing the cost of growing Nationwide's insurance business and paying Nationwide Bank interest

CLASS ACTION COMPLAINT

1    on the millions of dollars that the Insurance Defendants required many Agents to

2    borrow.

3          11.      Defendants' fraudulent scheme caused financial ruin to a large number

4    of the Agents who still retain substantial liabilities, including personal debt and loan

5    payments.  Other Agents have declared bankruptcy after Defendants told them they

6    had forgiven their loan obligations, but then issued them Form 1099s reporting the

7    loan forgiveness as "taxable income" to the Agents, creating huge tax liabilities that

8    Agents could not pay.

9          12.      If Defendants had not made the misrepresentations and false statements

10    described herein, the Agents would not have entered the Agent Programs; they

11    would not have agreed to borrow and invest hundreds of thousands of dollars in

12    Nationwide's agencies; and they would not have assumed loans and debt obligations

13    for building and growing Nationwide's agencies.

14          13.      The Agents bring this class action for damages against Defendants for

15    violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

16    U.S.C. §§ 1961 et seq., in particular, §§ 1962(c) and (d).

17                         **JURISDICTION AND VENUE**

18          14.      This Court has subject matter jurisdiction over Plaintiffs' federal law

19    claims arising under 18 U.S.C. § 1961 et seq. ("RICO") pursuant to 28 U.S.C. §

20    1331.

21          15.      Defendants are subject to personal jurisdiction in California because

22    they regularly transact a significant amount of business in California and the fraud

23    was carried out in California.

24          16.      Venue is proper in the Central District of California pursuant to 18

25    U.S.C. § 1965 and 28 U.S.C. § 1391, and because (1) Plaintiffs and Defendants are

26    both found, and transact their affairs, in this district; (2) Defendants maintain a

27    physical presence in this district; and (3) a substantial part of the events or omissions

28

CLASS ACTION COMPLAINT

giving rise to the claims at issue in this lawsuit occurred in this district, including but not limited to the following: Defendants employ Agents in the Central District of California; Defendants defrauded Agents in California and around the country;  and Defendants perpetuated their RICO enterprise and scheme to defraud in the Central District of California.

### PARTIES

17.      Plaintiff Cecil Goff, who resides in Orange County, California, was an Agent for Nationwide in the State of California between July 2013 and August 2015.

18.      During the time Mr. Goff was a Nationwide Agent, the Insurance Defendants required him invest approximately $200,000 in the Nationwide agency he operated.

19.      Mr. Goff participated in the Nationwide Advantage Program, a successor to the Replacement Agency Executive ("RAE") program.

20.      Nationwide terminated Mr. Goff approximately two years after he joined the Advantage Program, but before he completed the program and before he could recover his "investments" in Nationwide's agency.

21.      Plaintiff William Bergdoll, who resides in Scottsdale, Arizona, was an Agent for Nationwide between 2003 and 2017.

22.      Mr. Bergdoll participated in the Agency Executive ("AE") Program, and later became a "career agent" for Nationwide.

23.      Mr. Bergdoll separated from Nationwide in 2017, without recouping the "investments" the Insurance Defendants required him to make in Nationwide's agency.

24.      Plaintiff Patricia Pacheco, who resides in Los Angeles, California, has been an Agent for Nationwide in the State of California from March 2006 to the present.

CLASS ACTION COMPLAINT

25.     Ms. Pacheco was recruited into and participated in the Replacement Agency Executive Program ("RAE") program.

26.     Nationwide purported to "sell" Ms. Pacheco an existing group of policies, and Nationwide required her to pay for this book of business even though she obtained no ownership rights in this asset from this purported "sale."

27.     While in the RAE Program, Nationwide required Ms. Pacheco to borrow $113,202 in loans from Nationwide Bank to "invest" in what Nationwide told her was her business and her agency.  As a result, Ms. Pacheco has made over $100,000 of "investments" in the Insurance Defendants' agency that she has little or no prospect of recouping.

28.     In fact, as of 2017, Nationwide is asking its Agents, including Ms. Pacheco, to "re-purchase" the book of business from Nationwide.

29.     Despite the Insurance Defendants' projections and promises when she was recruited to Nationwide, Ms. Pacheco has never been able to recover her "investments" in Nationwide's agency and now faces retirement with nothing to show for her "investments."

30.     Defendant Nationwide Mutual Insurance Company ("Nationwide Mutual") is an Ohio corporation with its principal place of business at One Nationwide Plaza, Columbus, Ohio 43215.  Nationwide Mutual is licensed to do business in California.

31.     Defendant Nationwide Mutual Fire Insurance Company ("Nationwide Fire") is an Ohio corporation with its principal place of business at One Nationwide Plaza, Columbus, Ohio 43215.  Nationwide Fire is licensed to do business in California.

32.     Defendant Nationwide Mutual General Insurance Company ("Nationwide General") is an Ohio corporation with its principal place of business at

7

One Nationwide Plaza, Columbus, Ohio 43215.  Nationwide General is licensed to do business in California.

33.    Defendant Nationwide Property and Casualty Insurance Company ("Nationwide P&C") is an Ohio corporation with its principal place of business at One Nationwide Plaza, Columbus, Ohio 43215.  Nationwide P&C is licensed to do business in California.

34.    Defendant Nationwide Life Insurance Company ("Nationwide Life") is an Ohio corporation with its principal place of business at One Nationwide Plaza, Columbus, Ohio 43215.  Nationwide Life is licensed to do business in California.

35.    Defendant Nationwide Life and Annuity Insurance Company ("Nationwide Life and Annuity"), formerly Nationwide Variable Life Insurance Company, is an Ohio corporation with its principal place of business at One Nationwide Plaza, Columbus, Ohio 43215.  Nationwide Life and Annuity is licensed to do business in California.

36.    Defendant Nationwide Financial General Agency, Inc. is an Ohio corporation with its principal place of business at One Nationwide Plaza, Columbus, Ohio 43215.

37.    Nationwide Bank ("Nationwide Bank") is an Ohio corporation with its principal place of business at One Nationwide Plaza, Columbus, Ohio 43215.

38.    At all relevant times, the Insurance Defendants were engaged in selling insurance in throughout the United States, including the State of California.

39.    At all times relevant, Nationwide Bank was engaged in providing loans through the predatory Loan Programs to Agents through the United States, including in the State of California.

40.    At all relevant times, Defendants were engaged in a scheme to defraud the Agents through Nationwide's Agent Programs across the United States, including in the State of California and other states in the United States.

## FACTS

### I.  Defendants' Fraudulent Scheme

41.     Starting in 1999, Nationwide underwent several organizational changes, including installing a new CEO and a new Nationwide Insurance President, and restructuring its field management force.

42.     The new management team began focusing on an aggressive expansion and growth plan based predominantly on Direct Written Premium ("DWP") growth.

43.     The plan included expanding into new states, including California.

44.     By 2003, Defendants set in motion a fraudulent scheme to fund and facilitate Nationwide's aggressive growth plans by creating and implementing "Agent Programs," recruiting Agents into those Programs with knowingly false and fraudulent promises, and inducing Agents, once they were in the Programs, to "invest" substantial sums of money into the Insurance Defendants' agencies, typically through loans from Nationwide Bank.

45.     In order to recruit Agents, the Insurance Defendants knowingly and falsely promised them long and lucrative careers as Nationwide captive agents who would own their own books of business and agencies.

46.     However, unlike independent agents who run and manage their own business, Nationwide's captive agents do not own "their" Nationwide agencies, but were nevertheless induced by Nationwide to "invest" substantial sums of money in what were, in fact, Nationwide's agencies.

47.     As more fully described herein, Defendants' scheme included conspiring among affiliated, but separate, insurance company entities—the Insurance Defendants—and with an affiliated, but separate, financial institution—Nationwide Bank—to fraudulently induce, through use of the wires and United States mail, Agents to deplete their own personal capital and borrow substantial

CLASS ACTION COMPLAINT

1    sums of money from Nationwide Bank at high interest rates to fund the Insurance

2    Defendants' business.

3             **a. Defendants' Agent Programs**

4        48.        Starting in early 2003 and continuing through 2016, when Defendants

5    discontinued the Agent Programs, the Insurance Defendants facilitated the

6    fraudulent scheme by establishing various Agent Programs that they used to

7    promote the false representations regarding the opportunity to "own your own

8    business" and as the platform to a long and lucrative career "owning" a Nationwide

9    agency.

10        49.        The Agent Programs consisted of various programs, and Defendants

11    operated at least two forms of their Agent Programs in every state in which they

12    conducted business, including California.

13        50.        Nationwide created these Agent Programs to perpetuate Defendants'

14    fraudulent scheme and Defendants used all of the Programs in substantially the same

15    way to defraud the Agents out of hundreds of thousands of dollars in "investments"

16    in building Nationwide's agencies – agencies that did not belong to the Agents and

17    were not "their own businesses."

18        ***The AE Program***

19        51.        Under Nationwide's first Agent Program, the AE Program, Nationwide

20    had Agents start a Nationwide agency from "scratch'" that is, without any existing

21    policies.

22        52.        Nationwide initially required AE Agents to borrow approximately

23    $180,000 from Nationwide Bank to "invest" in a start-up agency.  Over time,

24    Nationwide's loan requirements for the AE Program and successor versions of the

25    Program grew to as much as $350,000 or more.

26        53.        The AE Program was 36 months long, and AE Agents could only

27    "complete the Program" if they earned $1.2M in Direct Written Premium ("DWP")

28

1    within the 36-month period; that is, after they built a book of business for the

2    Insurance Defendants.

3        54.        The Insurance Defendants created production reports that purported to

4    track the Agent's progress toward the $1.2 million in DWP goal, but the reports

5    were incomprehensible and misleading, as they regularly failed to reflect all the

6    policies sold to, and renewed by, the customers, and as a result, the Insurance

7    Defendants could, and did, tell Agents they were not meeting their production

8    requirements, when, in fact, they were.

9        55.        After the Agents worked hard to build what they thought were "their"

10   books of business, the Insurance Defendants were incentivized to fail the Agents and

11   terminate their contracts, prior to the Agents' completion of the Programs and/or

12   before Insurance Defendants repaid the Agents for their "investments." Moreover,

13   Nationwide could, and did, then "sell" a former Agent's book of business to another

14   Agent for a significant sum of money or save the commission stream entirely and

15   service the policies out of Nationwide's corporate headquarters.

16       ***The RAE Program***

17       56.        The RAE Program was a 37-month long program that was like the AE

18   Program in most important respects.

19       57.        In the RAE Program, Defendants did not have the Agents start a

20   Nationwide agency from scratch, but rather, Nationwide "sold" the Agents an

21   existing group of policies, known as a "book of business."   Although Nationwide

22   deliberately and repeatedly misrepresented to the RAE Program Agents that the

23   books of business they purchased were "theirs," in actuality, they were only

24   servicing and growing what were Nationwide's books of business.

25       58.        RAE Agents were required to make significant "investments" into

26   Nationwide's agencies with their own capital or with funds borrowed from

27   Nationwide Bank at high interest rates.

28

CLASS ACTION COMPLAINT

59.     Like the AE Program, the RAE Program was created to implement Defendants' scheme to grow the Insurance Defendants' business and generate large profits at the Agents' expense.

60.     As it did with AE Agents, Nationwide regularly and knowingly falsely told RAE Agents they were failing to meet their production requirements and that they could only get back on track by "purchasing" other Nationwide agencies, or by buying independent agencies and converting them to Nationwide agencies.  In other words, Nationwide told the Agents to continue investing more money in "their" agencies."

### *The Advantage Program*

61.     The Advantage Program was a later iteration of the RAE Program that functioned in the same way.  The Insurance Defendants "sold" new Advantage Program Agents a set of policies, intentionally and falsely representing to the Agents that they owned the policies, when in actuality, they were only servicing and growing Nationwide's policies.

62.     Like the RAE Program Agents, Nationwide required Advantage Program Agents to make large "investments" in Nationwide's agencies with their own capital, or with funds borrowed from Nationwide Bank at high interest rates.

63.     Defendants could have implemented any of the Agent Programs as legitimate programs to further their business purposes.  Instead, they opted to use the Agent Programs to carry out a fraudulent "investment" scheme.

b. **Defendants Made False and Misleading Statements to Induce Agents into the Agent Programs**

64.     Defendants' scheme depended on the Insurance Defendants recruiting a steady stream of participants to join the Agent Programs and invest in Nationwide's business.

CLASS ACTION COMPLAINT

65. Indeed, churning Agents through the Programs was a central part of Defendants' scheme because Defendants knew their Programs had an extremely high failure rate, and that most Agents would last only long enough to deplete their savings and retirement accounts while building one or more books of business for Nationwide. After the Agents failed and were terminated, Nationwide would keep those Agents' books of business and often "re-sell" them to other unsuspecting Agents or save the commission stream entirely and service the policies out of Nationwide's corporate headquarters.

66. The Insurance Defendants tasked their sales management teams with recruiting a steady stream of new Agents into the Programs. Upon information and belief, Nationwide evaluated its Sales Managers' job performance based on, among other things, whether they met recruitment quotas.

67. In order to recruit new Agents, the Insurance Defendants, including their business consultants and field sales managers, used the wires and United States mail to make numerous false statements and misrepresentations to both potential recruits and existing Agents to convince them to participate in the Agent Programs, to continue borrowing more and more money, and to invest in growing "their" books of business.

68. The Insurance Defendants told Agents that they would be "independent business owners" with the opportunity for a lucrative "career" at Nationwide, allegedly having the potential to earn $300,000 or more annually, through which the Agents would easily recoup their "investments."

69. Even after an Agent agreed to participate in an Agent Program and signed a Program Agency contract, Insurance Defendants continued calling the Agent a "business owner" or "agency owner," and referred to the Nationwide agency where the Agent worked, and the customers of that agency, as the "Agent's business."

CLASS ACTION COMPLAINT

70.     The Insurance Defendants' representations were knowingly false. In reality, Agents do not own a business separate and apart from Nationwide's book of business, and the customers are Nationwide's customers, not the Agents' customers.

71.     Upon information and belief, the Insurance Defendants make these false representations to obscure Nationwide's true ownership interest in, and control over, the Nationwide agencies, and to falsely imply that the only difference between a Nationwide Agent and an independent insurance agent is that the Nationwide Agent is a "captive" agent who can sell only Nationwide products, while an independent insurance agent can represent and sell the products of more than one insurance company.

72.     In fact, there are material differences between a Nationwide "captive" Agent and an independent agent which, in order to perpetuate its own fraudulent scheme, upon information and belief, the Insurance Defendants' never discloses to the Agents.

73.     Independent agents own their books of business, which is typically an insurance agency's only income-producing asset, and the customers are the independent agents' customers. An independent agent is free to sell his or her book of business at any time for any price, and if an insurance company terminates an independent agent, the books of business and customers remain with the independent agent. Thus, any investments independent agents make to grow their books of business are recoverable because the books of business belong to the independent agents.

74.     By contrast, Nationwide's captive Agents do not own the agencies' books of business, and they are not free to sell the books of business as they have no ownership rights in those assets. If Nationwide terminates an Agent, the book of business remains with Nationwide, and the customers remain Nationwide's customers. Thus, if Nationwide terminates an Agent, the Agent has no ability to

recover any investment he or she has made to grow the book of business, as that asset belongs to Nationwide.

75.    Not only did the Insurance Defendants knowingly falsely represent Agents' "ownership" interest in Nationwide's agencies, but they also knowingly made material misrepresentations about the risks of becoming a Nationwide Program Agent, and the required "investments" in a Nationwide agency.

76.    Specifically, the Insurance Defendants' Sales Managers recruited new Agents by distributing to them, using the U.S. mail, facsimiles, and electronic mail, projections/snapshots, pro formas, and business plans created by the Insurance Defendants that materially misrepresented the Agents' income potential; materially understated the expenses that the Insurance Defendants would require the Agents to incur; and hid what the Insurance Defendants knew were the Agents' low chance of success at Nationwide and the extraordinarily high Agent failure rates in the Agent Programs.

77.    Nationwide's inaccurate projections/snapshots, pro formas and business plans, however, were presented to recruits as allegedly realistic estimates of the growth and income potential for a Nationwide agency.  Nationwide falsely told Agents when recruiting them into Agent Programs, using the false and misleading projections/snap shots, pro formas and business plans, that the Agent Program's production requirements were realistic and attainable within the allotted time frame, whereupon they would graduate and move on to long and lucrative "careers" at Nationwide.

78.    The Insurance Defendants knew these projections/snap shots, pro formas and business plans were unrealistic, and that the Agents' chances of meeting these estimates were, at best, extremely low.

79.     Sales Managers also gave recruits for the RAE Program and Advantage Program projections/snap shots, pro formas, and business plans that misrepresented the quality of the books of business Nationwide was offering to "sell" to them.

80.     The Insurance Defendants knew these projections/snap shots, pro formas and business plans for the RAE and Advantage Programs regularly provided inaccurate representations of the quality of the books of business Nationwide would eventually "sell" to the Agents because, for example, the Insurance Defendants would either keep the more valuable assets (policies) for themselves or assign them to other Nationwide agents, and sell the lower-value policies to new, unsuspecting Agents.

81.     The Insurance Defendants provided this false and misleading information to Agents in order to persuade them to participate in the Agent Programs and take on the personal risks of making the substantial "investments" Nationwide would require of them to grow the business.

82.     The Insurance Defendants, and their sales managers and business consultants, also represented to the Agents that the Agent Programs were a viable and legitimate business opportunity, the success of which depended largely, if not solely, on the Agents' abilities.

83.     In fact, Defendants knew all along that most Agents, regardless of ability or effort, could never meet the Agent Programs' unrealistic requirements, and that it was highly likely the Insurance Defendants would terminate most Agents and the agencies they were operating would be unprofitable.

84.     The Insurance Defendants know of the Agent Programs' high failure rate, which they, in fact, manipulated. The Insurance Defendants intentionally rigged the Programs to ensure high agent turnover, including unilaterally changing the Program's production requirements to ensure Agents would not meet those requirements.

CLASS ACTION COMPLAINT

85. The Insurance Defendants benefitted from high Agent turnover because it meant that an ever-increasing number of Agents would "invest" in building and growing Nationwide's insurance business, but not remain with Nationwide long enough to recoup those "investments" through commissions paid to them by the Insurance Defendants.

86. Nationwide Bank benefitted from high Agent turnover because it increased the numbers of its new loans to Agents.

87. Defendants knew that, if they disclosed the high Agent failure rate in the Programs to Agents and potential recruits, Defendants would be unable to recruit the steady stream of participants needed to fuel their fraudulent scheme, and would be unable to defraud the Agents out of the large "investments" Nationwide required them to make, including the loans it required Agents to take to fund those "investments" to grow Nationwide's business.

88. Defendants hid and never disclosed to any potential or existing Agents, or to any existing Nationwide Agent, the Agent Programs' high failure rates; the Agents' exceedingly slim chance of meeting the Programs' requirements; or the fact that it was highly likely their required Nationwide Bank loans would not be forgiven, and their RAE payments would not be waived.

89. Defendants never revealed to any potential or existing Agent that Defendants had a purposeful scheme to defraud Program Agents out of their "investments," falsely tell the Agents they were failing to meet their DWP ("Direct Written Premium") requirements, and terminate them before they could recoup their "investments;" or that Nationwide would keep the books of business and customers the Agents worked to build, while the Agents would be stuck with the debt long after being terminated from Nationwide.

90. Defendants withheld from Agents and potential Agents that Nationwide would provide Agents with indecipherable production reports that Nationwide

CLASS ACTION COMPLAINT

would not explain to them, even when asked; that these reports misstated the Agents' sales and renewals; and that, ultimately, Nationwide would misuse these reports to tell Agents they were failing to meet their production requirements.

91.    Defendants also withheld from Agents the fact that that the Insurance Defendants would be regularly reducing the Agents' commissions, leaving a yawning gap between their actual income and the lofty, unrealistic income stream projections given to them during recruitment.   Further, Defendant did not disclose that Nationwide would unilaterally increase their DWP production requirements and/or the manner in which their production was calculated.

92.    Defendants hid these facts from recruits and Agents because, if the Agents were aware of the true risk of the Agent Programs, their actual success rates, and/or the likelihood of recouping their "investments," it would have been difficult, if not impossible, to recruit new Agents into the Programs, or persuade the Agents to continue "investing" in building Nationwide's books of business and agencies, including funding those "investments" through large loans from Nationwide Bank at high interest rates.

## II.    The Agreements

93.    As a result of these false promises and misrepresentations, Defendants induced a large number of Agents to participate in the Agent Programs and "invest" in building what they were told were "their businesses."

94.    The Insurance Defendants required each Agent to sign multiple agreements once they were persuaded to join an Agent Program, starting with a contract that was specific to the Program ("Program Agreements") they were joining, and an "Independent Contractor Agreement" ("IC Agreement").

95.    Each IC Agreement uniformly required Agents to bear all expenses associated with running "their" agencies.   IC Agreement at 2, ¶ 2 ("As an

independent contractor, you will pay all expenses in connection with your Nationwide insurance agency.").

96.     After each Agent signed a Program Agreement and an IC Agreement, the Insurance Defendants required them to "invest" significant capital, and/or take out a substantial loan from Nationwide Bank, to rent office space (the location of which Nationwide had to approve), to furnish the office, equip the office, hire staff, advertise, and operate the agency.

97.     The loan documents Defendants required Agents to sign included a "Credit Agreement and Promissory Note," a "Security Agreement," and a "Payroll Authorization Form."

98.     Agents, including Plaintiffs and the putative Class, were required to "invest" funds in Nationwide's agencies sufficient to cover the cost of bearing all expenses of the Nationwide agency, and did bear those expenses, often totaling tens or hundreds of thousands of dollars, including paying for:

     a.  Office space

     b.  Staff

     c.  Marketing

     d.  Advertising

     e.  Signage

     f.  Computers, phones and fax equipment

     g.  Forms

     h.  Record supplies

     i.  Office Supplies

     j.  Office equipment

99.     These "investments" in expenses were used to run a business that, ultimately, belonged to Nationwide and not the Agents.

CLASS ACTION COMPLAINT

### III.    Defendants Make the Agents Finance the "Investments" in Nationwide's Business

100.    The Insurance Defendants required all Agents to make significant "investments" in Nationwide's business.

101.    It did not matter to Defendants whether the Agents had sufficient capital to make those "investments;" nor did it matter to Defendants that the Agents would very likely never recover those "investments."

102.    In implementing their scheme, Defendants divided Program Agents into two groups:  those who had access to a specified amount of capital they could invest in a Nationwide agency, and those who did not.

103.    Defendants placed Agents having personal access to a specified amount of capital into the RAE Program (and successor Programs like the Advantage Program), and required these Agents to "invest" their own funds to build one or more Nationwide books of business.

### IV.    The AE Program Set Agents up to Fail

104.    Defendants placed Agents lacking the specified level of capital into the AE Program (and/or its successor programs), and required them to borrow between $180,000 and $350,000 from Nationwide Bank to start, invest in, operate, and grow an agency from scratch.

105.    Defendants knew that building a scratch agency is considerably more risky and expensive than growing an existing book of business, because, among other things, there is no pre-existing income stream to fund agency expenses or the Agent's living expenses.

106.    Defendants also knew that independent third-party lenders would not lend money to AE Program Agents because they had no ownership rights in the books of business they would be building.

CLASS ACTION COMPLAINT

107.     Commencing in 2003, the Insurance Defendants and Nationwide Bank created a predatory loan program, referred to herein as "the Agent Loan Program" or the "Loan Program," through which Nationwide required Agents to take out large loans to fund Nationwide's agencies.

108.     Defendants created the Loan Program so the Agents' inability to pay from their own personal funds for the "investments" Nationwide would require of them would not hinder Defendants' scheme.

109.     Defendants established the Loan Program knowing the Agents would not otherwise qualify for the loans required to fund the agencies because it was not possible to collateralize agencies they did not own.

110.     Defendants created and ran the Loan Program knowing that the Agents who did not have their own capital to finance these "investments" in the first place, would likely be financially ruined if they failed and/or if the Insurance Defendants terminated them, yet would still require the Agents to repay their loans.

111.     Defendants also knew, when creating and running the Loan Program, that Terminated Agents would also be left with the obligations they incurred while running the Insurance Defendants' agencies, including payroll taxes, an office for which they were still required to pay rent, equipment leases they still had to honor, and other financial obligations.

112.     Nevertheless, Defendants kept requiring AE Program Agents to take these predatory loans to fund "investments" in Nationwide's business.

113.     Even more egregious is the fact that the Agents were required to take the loans from an affiliated financial institution, Nationwide Bank, and were not able to obtain the loans in the open market.

114.     Nationwide Bank benefitted from the scheme by gaining an ever-growing pool of new customers who could not take their business elsewhere if they did not like the loan terms.

CLASS ACTION COMPLAINT

115.     The free market would have protected the Agents and provided them much needed information about the risks they were undertaking, because independent third-party banks would not have made such large, uncollateralized loans to Agents building scratch agencies who would have no independent means to repay the loans if Nationwide terminated them.

116.     Moreover, Nationwide Bank's loans were sham transactions that posed no meaningful risk of loss to Nationwide Bank because Nationwide Mutual "guaranteed" the Agents' loans if the Agents defaulted due to termination or otherwise.  Specifically, when the Insurance Defendants terminated an Agent and the Agent defaulted on his or her loan to Nationwide Bank, Nationwide Mutual paid off the Agent's loan, and Nationwide Bank assigned to Nationwide Mutual the right to collect the unpaid balance, plus interest.

117.     Nationwide Mutual agreed to function as a "guarantor" because it had access to the Agents' commissions and retirement earnings, which it could access as security for their loans and could access to deduct amounts to repay the loans.

118.     In addition to being "guarantor" of the loans, Nationwide Mutual acted as the administrator of the predatory loans, holding loan funds and releasing them in installments, known as "quarterly distributions," if the Agents met the Agent Programs' production requirements.  Thus, Program Agents only had access to the funds *they* "borrowed" from Nationwide Bank *if* they met Nationwide Insurance's production requirements.

119.     Nationwide Bank and the Insurance Defendants implemented this Loan Program because Nationwide Bank benefitted directly from the loans, as did the Insurance Defendants.  Even if an Agent ultimately failed to repay the loan, the Insurance Defendants, as "guarantor, had already received something far more valuable:  the book of business the Agent built.

120.    Even though the loans posed little to no risk to Nationwide Bank, Nationwide Bank regularly charged a high interest rate, typically 8% or more,  to Agents whom the Insurance Defendants required to participate in the Loan Program.

121.    Upon information and belief, Nationwide Bank earned millions of dollars on loans to Program Agents.

122.    The Insurance Defendants induced Agents to take these predatory loans by knowingly and falsely misrepresenting to them that they would recoup the loan funds through commissions they would earn as "independent" Nationwide agents, or through "loan waiver."

123.    The AE Program Agreements stated that Agents were "eligible" to achieve 50% waiver of the balance of their loans if they met their Minimum Production Plan requirements by the end of the Production Period (i.e., AE Program's 3-year term).

124.    From 2005 to 2007, the AE Program Agreement's Minimum Production Requirements included a cumulative Direct Written Premium ("DWP") requirement of $1.2 million ("Minimum Production Requirements") over the 3-year Program period.

125.    The AE Program Agreements stated that Agents were "eligible" to have 100% of their loan balance waived if they met their Minimum Production Plan requirements by the end of the Production Period, and earned an additional $375,000 in DWP.  Unbeknownst to Agents, however, Nationwide defined "eligible" as being "at Nationwide's discretion."

126.    The AE Agreement also stated that Agents were "eligible" to have 100% of their loan balance waived before the end of the 3-year AE Program, and terminate their AE Agreement, if they met their Minimum Production Plan by the end of the Production Period, earned an additional $375,000 in DWP, had $1.2 million in cumulative DWP over the prior 12 months, and had a 3-year or 1-month

CLASS ACTION COMPLAINT

paid loss ratio of 62% or less.  Again, Nationwide defined "eligible" as being "at Nationwide's discretion."

127.    The Insurance Defendants knowingly misrepresented to Agents that the Loan Program was an asset that would help them grow "their businesses," and that they would easily achieve loan waivers and/or earn so much money in commissions that they would easily meet their loan obligations.

128.    In reality, however, Defendants knew these requirements were unrealistic and almost always unattainable.

129.    Nationwide's corporate witness testified in the *Lucarell v. Nationwide* trial, that Nationwide knew that "[loan waiver] is a hard goal and not many -- not many meet it, but if you hit it out of the park, Nationwide Mutual will cut a check to Nationwide Bank and pay off the loan."  Mincy Tr. Trans. at 32:11-20.

130.    Defendants knew when making these knowingly false representations to Agents about the Loan Program that hardly any Program Agents ever qualified for loan waiver, and that Nationwide would terminate the vast majority of Agents before they could ever "hit it out of the park" or recoup their "investments."

131.    When making these knowingly false representations, Nationwide deliberately withheld from Agents that the AE Agent Programs' failure rate was extremely high, and that Nationwide would terminate most AE Agents before they recouped any part of their loans.

132.    Additionally, Nationwide reserved the right to change their production requirements at any time to ensure the Agents did not meet them.   And even if the Agents were meeting production requirements, Nationwide could, and did, misrepresent their sales and renewals on their production reports, telling the Agents they were failing to meet their requirements, when they were not, and terminating their employment.

CLASS ACTION COMPLAINT

## V.    **The RAE Program**

133.    As stated above, the RAE Program was for Agents who had access to a certain level of their own capital to "invest" in a Nationwide agency. The Insurance Defendants told RAE Program candidates they were buying a "book of business," and then charged them large sums of money up front to "purchase" that book of business.  In reality, the Agents were only "buying"  the right to *service*, for Nationwide, *the policies* in that book of business, while the Insurance Defendants maintained ownership and control of the book of business.

134.    The Insurance Defendants and Nationwide Bank also devised and operated a Loan Program similar to the AE Program Agent Loan Program, and made loans exclusively from Nationwide Bank in order to fund the huge "investments" Nationwide required them to make in Nationwide's agencies.

135.    To get an Agent to participate in the RAE Program, "buy" an existing book of business, and meet certain Minimum Production Requirements, the RAE Agreement stated that the value of the assigned policies was 150% of the "income" of the book of business, with proof of this alleged "income" being within Insurance Defendants' sole custody and control.   The Insurance Defendants defined "income" as 95% of the renewal service fees (commissions) attributable to the book of business in the preceding 12 months, although Insurance Defendants reserved the right to adjust this figure at their discretion.

136.    Nationwide required RAE Program Agents to make, within the first 37 months of being in the RAE Program, two large lump-sum payments that totaled 150% of the "income" of the book of business.

137.    The amount of the first payment was 100% of the "income" of the book of business assigned to the Agent, and Nationwide required RAE Program Agents to pay this amount after being in the RAE Program for 6 months.

CLASS ACTION COMPLAINT

138.     The amount of the second payment was 50% of the "income" of the book of business assigned to the Agent, and Nationwide required RAE Program Agents to pay this amount after being in the RAE Program for 37 months.

139.     RAE Agents were "eligible" to have Nationwide waive their second payment if they met certain growth requirements established by the Insurance Defendants.  As with the AE Program, the Insurance Defendants knowingly misrepresented the likelihood of RAE Agents meeting waiver requirements in order to lead them into believing that waiver was likely when, in reality, it was highly unlikely.

140.     If an RAE Agent missed either the first or second payment, the Insurance Defendants would either reassign the policies with the Agent simply losing his or her "investment," or place the Agent on a "shortfall" program.

141.     Even if an RAE Agent made both payments, he or she still did not obtain any "ownership rights" in the assigned book of business.

142.     Additionally, the Insurance Defendants often told RAE Program Agents they were not meeting their production requirements, and that the only way for them to do so was to "buy" another book of business from a departing Nationwide agent, or to buy an independent agency from an independent agent.

143.     The Insurance Defendants knowingly provided RAE candidates and RAE Agents with false and misleading projections/snap shots, pro formas and business plans, using the United States mail, facsimiles, and electronic mail, to portray the RAE Program as a high-earning career position, in order to induce recruits and Agents to participate in it and continue investing in  Nationwide's agencies.

144.     Defendants knew, however, that the Insurance Defendants would tell the overwhelming majority of RAE Program Agents that they were failing to meet their program requirements, place them on a "shortfall program," then terminate

1    them and keep the books of business Agents had "bought" and worked hard to grow,

2    and that this would likely occur long before these Agents ever recouped their

3    "investments."

4        145.    The Insurance Defendants had sole discretion over RAE Agents'

5    Production Plans, could vary the terms at will, and could manipulate the

6    requirements to ensure that the overwhelming majority of RAE Agents would not

7    meet the Program's requirements.  And for those who did meet the ever-changing

8    Program requirements, Nationwide could, and did, manipulate their production

9    reports to reflect that they were not.\

10       146.    As with the AE Program, RAE Agents paid all expenses of running

11   Nationwide's agencies, and many were left with debt and financially ruined after

12   Nationwide terminated them.

13       147.    As of January 2017, Nationwide asking Agents to "re-purchase" the

14   books of business they had allegedly already "bought" from Nationwide, earlier in

15   their career for large sums of money.

16   **VI.**    **Nationwide Modifies the Agent Programs to Continue the Scheme to**

17       **Defraud**

18       148.    By at least 2005, Defendants knew Program Agents were failing at an

19   exceedingly high rate as a direct consequence of the Defendants' scheme to defraud.

20       149.    Starting in approximately 2005, numerous Agents began telling their

21   sales managers and the Insurance Defendants' upper-level managers and V.P.s that

22   the Programs' production requirements were impossible to meet, in part because of

23   Nationwide's increasing production requirements, manipulated production reports,

24   and demands that the Agents spend ever more money on advertising with

25   Nationwide's advertising affiliate, rent expensive office space, pay a percentage of

26   their commissions for Nationwide's call center even if they did not use the call

27   center, and incur other expenses.

28

150.    Also in approximately 2005, at least one upper-level Nationwide manager told a Nationwide executive management team member that one or more of the Agents under her supervision was going to fail regardless of how the pro formas or business plans were tweaked, and pointed out numerous other flaws in the AE Program that caused AE Program Agents to fall quickly behind on their production requirements. Nationwide simply ignored this information and proceeded with its fraudulent scheme.

151.    Moreover, because some Agents were meeting their production requirements, Nationwide took certain actions to ensure those Agents failed, including:  changing their production requirements, omitting policies sold and renewed from their production reports, and changing the method of calculating DWP from "cumulative" to "12 month moving."

152.    When a few Program Agents still met their production requirements despite Nationwide's actions to ensure they would not, Nationwide amended the Program Agreements to make the production requirements even more difficult to meet, while telling Program Agents that the Program Agreements were being modified to make it easier for Agents to meet their DWP requirements.

153.    By late 2006 or early 2007, Defendants knew that the Insurance Defendants were about to roll out new Agreements that would make it more difficult for Program Agents to meet their production requirements, and almost impossible to be eligible for loan waivers.

154.    Realizing this could result in liability for Defendants, the Insurance Defendants offered to pay Agents between $15,000 and $35,000 to sign a Memorandum of Understanding ("MOU"), which basically stated that the Agents agreed to sign the new contract when Nationwide presented it to them, and which purportedly contained a waiver of their right to sue Defendants for any issue relating to the Agent Programs.

CLASS ACTION COMPLAINT

155.    The Insurance Defendants told Program Agents they were required to sign the MOU immediately -- long before they ever received a copy of the new Program Agreements, and that Agents who rejected the "offer" would be immediately terminated, meaning they would immediately lose "their agencies" but retain all the liabilities associated with the agency, including their lease agreements, payroll taxes, and any loans from Nationwide Bank.

156.    The Insurance Defendants then created a new Program Agreement containing much more stringent production requirements and a new way for Nationwide to measure the Agents' production (the AE II Agreement and the NRAE Agreement).

157.    The Amended AE ("AE II") Agreement required the Agents to write/sell $1.6 to $1.8M of DWP, rather than $1.2M of DWP as required by the original AE Agreement.

158.    The Insurance Defendants also surreptitiously changed the production requirements in the AE II Agreement from "cumulative" to "12-month moving."

159.    The AE II Agreement also modified the loan waiver provisions to reflect the new growth requirements, changing the waiver "eligibility" requirement from $1.2M cumulatively over 3 years, to between $1.2 and $1.6M on a "12-month moving" basis.

160.    Defendants subjected their Agents to duress, and coerced them to sign the new Agreements by telling them that the terms were non-negotiable, and that, if they did not sign the new Agreement, they would be terminated immediately and left with no job, no income, and hundreds of thousands of dollars of debt, including debts for funds they borrowed from Nationwide Bank.

161.    During this process, Defendants deliberately misrepresented to the Agents that the AE II Agreement's requirements were easier to meet, while intentionally withholding from them the fact that changing the DWP calculation

CLASS ACTION COMPLAINT

from "cumulative" to "12-month-moving" was a dramatically adverse change to the original Program requirements, making it virtually impossible for Agents to meet their production requirements.

162.     When the Insurance Defendants created and provided Agents with documents that purported to illustrate the new production requirements, even the illustrations were deceiving; that is, it was not apparent from the illustrations that the new production requirements required Agents to dramatically increase their production (by approximately 96%) from year 3 to year 4.  To further obscure this dramatic increase, the Insurance Defendants set the 3rd year's production requirements lower than the 2nd year's production requirements.

163.     In fact, Nationwide often deliberately failed, and sometimes refused, to provide Agents with a copy of the AE II Agreement they signed.

164.     Moreover, upon information and belief, at this time, the Insurance Defendants started applying the new loan waiver requirements retroactively, and modified the DWP production reports to make it appear as though the new requirements existed all along.

165.     Also around this time, the Insurance Defendants made the RAE Program's production requirements more stringent.

166.     For example, Nationwide required RAE Agents to sign Amended Agreements in 2007, which included a slightly reduced payment schedule, but also included a "waiver" of all claims against the Insurance Defendants and Nationwide Bank, and changed the measurement method from "cumulative" to "12-month moving."

167.     Nationwide also coerced RAE Agents into signing the modified RAE Agreement upon threat of immediate termination, and often deliberately failed, and sometimes refused, to provide them with a copy of the modified RAE Agreement they signed.

CLASS ACTION COMPLAINT

168.     In many instances, Nationwide required Agents to sign MOUs more than a year before receiving the new Agreement or knowing what their new production requirements would be.

169.     At no time prior to Insurance Defendants requiring their Agents to sign the MOUs or the new Agreements, nor any time thereafter, did any Defendant disclose or acknowledge to any Agents Insurance Defendants' prior false statements and misrepresentations, or their deliberate concealment of the failure rate of Program Agents.

170.     Instead, Defendants took affirmative steps to conceal the fraud. For example, when Shelley Aaserud, a former employee and Nationwide business consultant who was involved in helping to prepare the misleading and false projections/snap shots, pro formas and business plans, testified about Defendants' fraudulent scheme in a one court case, Nationwide obtained a court injunction to bar her from testifying as an expert in any other case, and from disclosing Nationwide's "non-public information" regarding any Agent Program.

171.     The purported "Releases" Defendants coerced the Agents to sign are unenforceable because they were procured by fraud and/or duress.

## VII.     The Fraud Damaged the Agents

172.     From its inception in 2003 through the present, Defendants' scheme benefited Defendants and damaged the Agents.

173.     The Insurance Defendants benefited from the scheme by:  retaining ownership and possession of the valuable books of business the Agents paid to build.

174.     Nationwide Bank benefited from the scheme by continually receiving a new pool of captive "borrowers," and receiving interest payments on what were essentially low, or no, risk loans.

CLASS ACTION COMPLAINT

175.    The Agents were damaged by the scheme by investing large sums of money in Nationwide's business, and assuming debts they would otherwise not have assumed, but for Defendants' fraudulent scheme.

176.    For example, Plaintiff Bergdoll was required to borrow more than $350,000 to run Nationwide's business during the time period in which he participated in Nationwide's AE Program.

177.    When Mr. Bergdoll first joined the AE Program, Defendants required him to borrow $222,000, exclusively from Nationwide Bank, at Nationwide Bank's high interest rates, without shopping the open market for better rates.

178.    Mr. Bergdoll was one of the few AE Program Agents who was on track to meet the loan waiver eligibility requirements, but a few months before he completed the AE Program with full loan waiver eligibility for his $222,000 loan and became a "career agent," Nationwide then induced him to borrow an additional $130,000.  Instead of waiving his $222,000 loan and giving him new production requirements for the $130,000 loan, Nationwide lumped both loans together, said he had not achieved loan waiver, and charged him interest on the $350,000 combined amount of the loans.

179.    When Mr. Bergdoll completed the AE Program, the Insurance Defendants began deducting approximately $1,800 per month from his commission checks as installment payments toward his loans, and he worked hard to repay the loans over the next 7 years, while interest on the loans was compounding.  Thus, even though he had achieved partial waiver of the $130,000 loan based on his production, he ultimately repaid $129,000 – almost the entire loan.

180.    As with all other Agents, Nationwide required Mr. Bergdoll to invest hundreds of thousands of dollars in the Nationwide agency he operated.  Despite being one of the few Agents to complete the AE Program, he never recouped the "investments" Nationwide required him to make as a participant of the AE Program.

181.    When recruiting him to become a Program Agent, the Insurance
Defendants deliberately provided Mr. Bergdoll with false, materially inflated,
income projections. Similarly, when recruiting him to become a Program Agent, the
Insurance Defendants deliberately provided Mr. Bergdoll with false, materially
understated, expense projections.

182.    By participating in the AE and AE II Programs, Nationwide placed Mr.
Bergdoll in a financial abyss from which he has not been able to dig himself out.
After almost a decade of joining the AE Program, Mr. Bergdoll finally paid off the
hundreds of thousands of dollars Nationwide required him to borrow to run its
business, as well as the tens of thousands of dollars in advertising, lease, call center,
equipment, furniture, and payroll expenses.  Still, he has hundreds of thousands of
dollars of personal debt resulting from Nationwide's fraudulent scheme.

183.    Nationwide also required Plaintiff Goff, who participated in the
Advantage Program for 2 years, to "invest" tens of thousands of dollars of his own
personal funds in a Nationwide agency, after which Nationwide terminated him,
allegedly for failing to meet his production requirements.  Consistent with the goal
of their scheme, Defendants retained Mr. Goff as an Agent long enough for him to
"invest" nearly $200,000 of his own personal funds into a Nationwide agency and
build what was, unbeknown to him, Nationwide's book of business, and terminated
him before he could recoup this "investment."

184.    Nationwide also required Plaintiff Pacheco to "invest" more than
$100,000 in the Nationwide agency she has been managing, by borrowing those
funds [from Nationwide Bank].   She is not even close to recouping these
"investments," and does not own the agency in which she has been investing,  yet
Nationwide is now asking her to "re-purchase" the book of business Nationwide told
her,  which she believed, she had "purchased" years ago.

185.    Nationwide terminated the overwhelming majority of Program Agents and kept the books of business they built, after they "invested" tens, or hundreds, of thousands of dollars into one or more Nationwide agencies, leaving them saddled with debt and in financial ruin.  This overwhelming majority has had no choice but to liquidate any remaining assets they had, borrow money from other sources, and/or file for bankruptcy in an effort to try to dig themselves out of the financial havoc in which Defendants placed them by way of their fraudulent scheme.

## VIII.    Tolling of the Statute of Limitations

186.    Since 2003, Defendants have vigorously concealed their fraudulent scheme from Plaintiffs and Class Members, because the success of their scheme depended on concealing from the Agents:  the failure rates of the Agent Programs; the actual likelihood of the Agents recouping their  "investments"; the fact that the Agents would not own the books of business they purchased and/or grew; the amount of expenses the Insurance Defendants would require them to pay; and/or the actual net income they would earn as a Nationwide Program Agent.

187.    To date, Defendants continue to withhold from Agents critical information of which Defendants are aware, including the Agent Programs' failure rates, the falsity of the projections/snap shots, pro formas and Business Plans the Insurance Defendants prepared for them, and/or the statistics reflecting the virtual impossibility of Agents meeting loan waiver requirements.

188.    In fact, Defendants have gone to great lengths to withhold these facts from their Agents, potential agents, the public, and former Agents.   As a result of the complex and fraudulent nature of the Defendants' scheme and Defendants' concealment of the scheme, Plaintiffs were not, and could not have been, aware of the facts relating to the scheme earlier than the conclusion of the investigation leading up to the filing of this Complaint.

189.    Plaintiffs could not have discovered Defendants' conduct, the enterprise, or the success of the enterprise, by exercising reasonable diligence.

190.    Therefore, any applicable statutes of limitations have been tolled by Defendants' knowing, ongoing, and active concealment and denial of the facts stated herein.

191.    Defendants intentionally kept the Plaintiffs and Class Members in the dark about information essential to pursue their claims.   Accordingly, Defendants are estopped from relying on any statute of limitations to defeat the claims asserted herein.

## CLASS ALLEGATIONS

192.    Class Definition: Plaintiffs brings this action on behalf of themselves and all similarly situated Class members pursuant to Rule 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and seek certification of the following Classes:

> All individuals who participated as an agent in a Nationwide Agent Program during the Class Period, who were required to invest money in Nationwide's agencies, who owe money to Nationwide as a result of participating in an Agent Program, and/or who previously owed money to Nationwide as a result of participating in an Agent Program.

193.    The "Class Period" begins on the date the Court determines is the applicable statute of limitations, after considering any tolling and accrual issues, and ending on the date judgment is entered.

194.    Numerosity: The members of the Class are so numerous that joinder of all members would not be feasible or practicable.  Plaintiffs are unaware at this time of the precise number of Class members, but estimate the Class is comprised of more than One Thousand (1,000) individuals.  The identity of the members of the Class is readily ascertainable from Defendants' records.

195.    <u>Common Questions of Law and Fact Predominate</u>:  Common questions of law and fact as to Plaintiffs and all other similarly situated employees predominate over questions affecting just individual members, including, but not limited to:

a.  Whether Defendants engaged in a scheme to defraud the Plaintiffs in order to induce them to participate in Agent Programs and pay for the cost of running Nationwide's businesses;

b.  Whether Defendants made knowing misrepresentations to the Agents, including that they would be, and were, business owners, when in fact Nationwide owned all Program Agents' books of business, customers, and agencies;

c.  Whether Defendants engaged in mail and/or wire fraud;

d.  Whether Defendants engaged in a pattern of racketeering activity;

e.  Whether the alleged RICO Enterprise is an "enterprise" within the meaning of U.S. 1961 (4);

f.  Whether Defendants conducted, or participated, in the affairs of the RICO Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c);

g.  Whether Defendants conspired to violate 18 U.S.C. 1962(c) in violation of 18 U.S.C. 1962(d).

196.    <u>Typicality</u>:    Plaintiffs' claims are typical of the claims of the Class members in that Plaintiffs, and each member of the Class, participated in an Agent Program, and have suffered, and will continue to suffer, financial devastation and other damages as a direct result of Defendants' conduct.

197.    <u>Superiority</u>:  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  Class-wide litigation of common issues will reduce litigation costs and promote greater judicial efficiency. Furthermore, even if Class members could afford individualized litigation,

CLASS ACTION COMPLAINT

1   individualized claims brought by members of the Class would present a danger of

2   inconsistent or contradictory judgments arising from the same set of facts.

3   Individualized litigation would also increase the delay and expense to all parties and

4   the judicial system by virtue of the issues in this action.  By contrast, the class action

5   device provides the benefits of adjudication of these issues in a single proceeding,

6   economies of scale, and comprehensive supervision by a single court, and presents

7   no unusual management difficulties under the circumstances present here.

8        198.    Adequacy of Representation:  Plaintiffs are fully prepared to take all

9   steps necessary to fairly and adequately represent the Class members' interests.

10  Moreover, Plaintiffs' attorneys are ready, willing, and able to fully and adequately

11  represent Plaintiffs and the Class members.  Plaintiffs' attorneys are experienced in

12  prosecuting class actions and employee misclassification cases, and are committed

13  to vigorously prosecuting this case on behalf of the Class members.

14

15               **FIRST CAUSE OF ACTION**

16      **Brought on Behalf of Plaintiffs and the National Class**
    **(Violation of the Racketeer Influenced and Corrupt Organizations Act, 18**

17               **U.S.C. Section 1962(c))**

18       199.    Plaintiffs and the Class incorporate herein all paragraphs set forth

19  above.

20       200.    In violation of 18 U.S.C. § 1962(c), Defendants conducted or

21  participated, directly or indirectly, in the conduct of the affairs of a RICO Enterprise

22  through a pattern of racketeering activity.

23       201.    Specifically, the Defendants, led by Nationwide Mutual Insurance

24  Company and Nationwide Bank, associated-in-fact as an enterprise in order to

25  rapidly increase the sale of Nationwide insurance products by recruiting Agents (the

26  Plaintiffs and putative Class members) into their Agent Programs under false

27  pretenses, and deceiving them into "investing" large sums of money in buying and

28

1    building, and/or building from scratch, insurance agencies for Defendants' benefit,

2    knowing that the overwhelming majority of Program Agents would fail and/or never

3    recoup their "investments," leaving them with hundreds of thousands of dollars of

4    debt and financial obligations.

5        202.    Nationwide Mutual Insurance conceived of, and administered, the

6    Agent Programs; recruited individuals into their Agent Programs with knowingly

7    false statements; appointed the Agents to sell their property and casualty insurance

8    products; managed, oversaw, watched, controlled, and disciplined Program Agents;

9    identified books of business to "sell" to Program Agents; created the Agent

10   Programs' production requirements; and created and distributed indecipherable

11   production reports that falsely reflected the Program Agents' sales and renewals; and

12   established and ran the predatory loan program with Nationwide Bank and continues

13   to collect the payments therefrom.

14       203.    Nationwide Bank participated in the Agent Program enterprise by

15   providing and managing millions of dollars of financing (loans) to Agents,

16   regardless of their lack of assets or other collateral to secure the loans, and regardless

17   of their independent inability to repay the loans when Nationwide terminated them.

18   After termination, the Agent Program enterprise continued with Nationwide Mutual

19   assuming the Program Agents' loans from Nationwide Bank, and  proceeding to

20   collect both principal and interest on these loans.  Upon information and belief, the

21   Agent Programs were not feasible without the financing provided by Nationwide

22   Bank because Program Agents had no ownership interest in the agencies they

23   operated or the policies they sold, and therefore had no collateral to secure a loan

24   from a traditional third-party lender.

25       204.    The other Insurance Defendants participated in the Agent Programs by

26   appointing Program Agents to sell their product lines (such fire, life, and variable

27   annuities) on their behalf.  They allowed Nationwide Mutual to recruit Agents into

28

CLASS ACTION COMPLAINT

1   the Agent Programs on their behalf, set and concealed unrealistic requirements for

2   production and loan waiver "eligibility", misrepresented the chance of Agents

3   recouping their required "investments" and/or their chance of being able to repay the

4   substantial loans Insurance Defendants required them to take from Nationwide

5   Bank, while knowing the Program Agents' chance of success was extremely slim,

6   and that the goal of the scheme was to increase DWP for Nationwide Mutual and the

7   other Defendant insurers.

8        205.    Defendants' associated-in-fact enterprise functioned as a continuing

9   unit, and pursued the goals of the Agent Programs' existence starting in

10   approximately 2003, and continuing to this day by, for example, collecting payments

11   and interest on loans taken by Agents in order to participate in the Agent Programs,

12   and/or threatening lawsuits to collect monies owed by former Agents who have

13   missed loan payments.

14        206.    Defendants conducted the associated-in-fact enterprise through a

15   pattern of racketeering activity.

16        207.    Nationwide Mutual used the wires (phone and/or email) to:

17        a.    advertise the benefits of the Agent Programs on Nationwide's website

18   and in trade journals and other periodicals, in order to recruit Agents into the

19   Programs;

20        b.    distribute false and/or misleading information to Agents, such as

21   recruiting materials stating that Agents would own their own businesses or be

22   "business owners";

23        c.    distribute pro formas, business plans, projections of agency revenue,

24   "snapshots," and production reports;

25        d.    deliberately send customers letters under the name of Nationwide

26   Program Agents who had already separated from Nationwide, in order to give the

27   appearance and impression that the Agents were still with Nationwide;

28

CLASS ACTION COMPLAINT

e.  instruct its Sales Managers, Regional Managers, Vice Presidents of Sales, and others, on how to administer the Agent Programs, when to terminate Agents, when to place Agents on "shortfall programs," and how to manage their Agents, all with the intention and purpose of carrying out the scheme;

f.  In cooperation with Nationwide Bank, Nationwide Mutual used the wires to periodically "release" to send notices to Agents confirming the amount of money they borrowed from Nationwide Bank;

g.  deduct loan payments from Program Agents' commissions;

h.  correspond with former Agents to collect, or threaten to collect, monies owed on loans Defendants required them to take in order for them to participate in an Agent Program; and

i.  communicate with the other Defendants and Agents regarding the misleading projections/snap shots, pro formas and business plans.

208.  Nationwide Bank used the mail or wires (email) to transmit loan documents to Program Agents for their signature.

209.  The other Insurance Defendants used the mail or wires to:

a.  notify Program Agents that they had been appointed to sell the Insurance Defendants' insurance products;

b.  contract with Program Agents; and

c.  terminate Program Agents.

210.  In each instance, Defendants used the mail and wires for the purpose of executing, or attempting to execute, the above-described associated-in-fact enterprise, the purpose of which was to defraud the Agents.   Upon information and belief, Defendants would not have been unable to execute the scheme to defraud without using the mail and wires.

211.  The racketeering activity described herein directly and proximately caused the injuries Plaintiffs and the Class have sustained, as Plaintiffs and the Class

1   were Defendants' intended victims and targets of their scheme, and each Plaintiff

2   and Class member suffered tens or hundreds of thousands of dollars of losses as a

3   result of Defendants' scheme.

4       212.    As previously stated herein, Defendants knew Plaintiffs and the Class

5   would each lose tens or hundreds of thousands of dollars as a direct result of

6   Defendants' scheme, and further knew that dozens, if not hundreds, of Agents would

7   eventually file for bankruptcy after Defendants left them with all the liabilities of

8   running Nationwide's agencies, but none of the assets, which facts Defendants

9   deliberately concealed from Plaintiffs and the Class.

10      213.    As a result and by reason of the foregoing, Plaintiffs and Class

11  members have been injured, suffered harm, and sustained damage to their business

12  and property, and are therefore entitled to recover actual and treble damages, and

13  their costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. §

14  1964(c).

## SECOND CAUSE OF ACTION
### Brought on Behalf of Plaintiffs and the National Class
### (Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Section 1962(d))

18      214.    Plaintiffs and the Class incorporate herein all paragraphs set forth

19  above.

20      215.    This claim arises under 18 U.S.C. § 1962(d), which provides in

21  relevant part: "It shall be unlawful for any person to conspire to violate any of the

22  provisions of subsection …(c) of this section."

23      216.    In violation of 18 U.S.C. § 1962(d), the Insurance Defendants and

24  Nationwide Bank conspired to defraud Plaintiffs and other Class members out of

25  their money and property pursuant to the pattern of racketeering activity and

26  fraudulent scheme described herein.  Insurance Defendants and Nationwide Bank

27  (the Enterprise Associates) agreed to conduct, and/or participate in, the affairs of the

28

CLASS ACTION COMPLAINT

1   enterprise, and agreed to commit at least two (2) of the predicate acts identified

2   above.

3       217.     Through their alleged racketeering activity, Defendants directly and

4   proximately caused Plaintiffs' and the Class members' damages.

5       218.     As a result, and by reason of the foregoing, Plaintiffs and Class

6   members have been injured, suffered harm, and sustained damage to their business

7   and property, and are therefore entitled to recover actual and treble damages and

8   their costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. §

9   1964(c).

## PRAYER FOR RELIEF

11      WHEREFORE, Plaintiffs pray for the following relief on behalf of

12  themselves and the Class against the Defendants:

13      A.  Certification of this action as a class action and appointment of Plaintiffs and

14  Plaintiffs' counsel to represent the Classes;

15      B.  Awarding Plaintiffs and the National RICO Class compensatory damages,

16  trebled, in an amount to be determined at trial;

17      C.  Awarding Plaintiffs declaratory and injunctive relief;

18      D.  Awarding Plaintiffs attorneys' fees and costs; and

19      E.  Affording Plaintiffs with such further and other relief as deemed just and

20  proper by the Court.

21

22  Dated this 6th day of October, 2017

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NELSON & FRAENKEL LLP**

By: /s Gabriel Barenfeld
Gretchen M. Nelson, Esq.
gnelson@nflawform.com
Gabriel S. Barenfeld, Esq.
gbarenfeld@nflawfirm.com
707 Wilshire Boulevard
Los Angeles, CA 90017
Tel.: (213) 622-6469
Fax: (213) 622-6019


**CRUEGER DICKINSON LLC**

Charles J. Crueger, Esq.
cjc@cruegerdickinson.com
Erin K. Dickinson, Esq.
ekd@cruegerdickinson.com
4532 North Oakland Avenue
Whitefish Bay, WI 53211
Tel.: (414) 210-3868

**WEXLER WALLACE LLP**

Edward A. Wallace, Esq.
eaw@wexlerwallace.com
Kara A. Elgersma, Esq.
kae@wexlerwallace.com
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Tel.: (312) 346-2222
Fax: (312) 346-0022

**GREG COLEMAN LAW**

Greg F. Coleman, Esq.
greg@gregcolemanlaw.com
800 S. Gay Street, Suite 1100

43

Knoxville, TN 37929
Tel.: (865) 247-0080
Fax: (865) 522-0049

**CARYN GROEDEL &
ASSOCIATES CO., LPA**

Caryn Markowitz Groedel, Esq.
cgroedel@groedel-law.com
Matthew Grimsley, Esq.
mgrimsley@groedel-law.com
31340 Solon Road, Suite 27
Cleveland, OH 44139
Tel.: (440) 544-1122
Fax: (440) 996-0064

**TURKE & STRAUSS LLP**

Samuel J. Strauss, Esq.
sam@turkestrauss.com
613 Williamson Street, Suite 201
Madison, WI 53703
Tel.: (608) 237-1775

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial of all issues so triable.

Dated this 6th day of October, 2017

**NELSON & FRAENKEL LLP**

By: /s Gabriel Barenfeld
Gretchen M. Nelson, Esq.
gnelson@nflawform.com
Gabriel S. Barenfeld, Esq.
gbarenfeld@nflawfirm.com
707 Wilshire Boulevard
Los Angeles, CA 90017

44

Tel.: (213) 622-6469
Fax: (213) 622-6019


**CRUEGER DICKINSON LLC**

Charles J. Crueger, Esq.
cjc@cruegerdickinson.com
Erin K. Dickinson, Esq.
ekd@cruegerdickinson.com
4532 North Oakland Avenue
Whitefish Bay, WI 53211
Tel.: (414) 210-3868

**WEXLER WALLACE LLP**

Edward A. Wallace, Esq.
eaw@wexlerwallace.com
Kara A. Elgersma, Esq.
kae@wexlerwallace.com
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Tel.: (312) 346-2222
Fax: (312) 346-0022

**GREG COLEMAN LAW**

Greg F. Coleman, Esq.
greg@gregcolemanlaw.com
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel.: (865) 247-0080
Fax: (865) 522-0049

**CARYN GROEDEL & ASSOCIATES CO., LPA**

Caryn Markowitz Groedel, Esq.
cgroedel@groedel-law.com
31340 Solon Road, Suite 27
Cleveland, OH 44139

CLASS ACTION COMPLAINT

1

Tel.: (440) 544-1122
Fax: (440) 996-0064

2

3

**TURKE & STRAUSS LLP**

4

5

Samuel J. Strauss, Esq.
sam@turkestrauss.com

6

613 Williamson Street, Suite 201
Madison, WI 53703

7

Tel.: (608) 237-1775

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT